Good morning, Your Honors. Greg Hurley on behalf of Defendant Appellants AMC Movie Theaters. This is an Americans with Disabilities Act case about companion seating in movie theaters. The situation before the court is this. It was the opening weekend screening of a popular movie, Chicken Run. The movie ultimately sold out. The plaintiff is a wheelchair user, and his wife was his companion. They arrived at the theater approximately 20 minutes prior to the screening. In our theater, we have two areas of wheelchair seating. We have an area with two wheelchair spots in one location in the theater, and then in a separate area we have another area of two wheelchair spaces. So how does this exactly work? You have a wheelchair spot, and then a companion seat, and then a wheelchair spot, and then a companion seat? There's a diagram that we submitted, and it's in the record, that shows the way the regulations suggest that the wheelchair spaces be constructed. And what they are is paired wheelchair spaces. So how was this theater actually constructed? It was constructed with two sets of paired wheelchair spaces. Wheelchair space, wheelchair space. And then regulations say that for that wheelchair area, those two wheelchair spaces, that one companion seat is required. What AMC does is it goes beyond that and says, next to each wheelchair space, we're going to put a companion seat. So we designate the seat to the left and the seat to the right as companion seats. So it's companion, wheelchair, wheelchair, companion. Exactly. And that appears twice in your theater. Exactly. Okay. And again, the law only requires one companion seat for each wheelchair area. We provide one companion seat for each wheelchair space. When the plaintiffs arrived at the theater, they saw an individual with his son sitting in one of the companion seats, and they saw a woman with her children occupying the second companion seat with a stroller in the wheelchair area. The plaintiffs asked the man and his son to move so that they could use those seats. That man refused to move. At that point, approximately 4.35 p.m., approximately ten minutes prior to the movie's screening, the plaintiffs first approached AMC's management and asked AMC to assist them in locating a wheelchair space and adjoining companion seat. AMC's manager did that, went to the man who was sitting or his son was sitting in the companion seat and explained to him, look, there are patrons that need these seats. Will you please move to another seat? He may or may not have offered him a pass to another movie. Our policy includes offering a pass to encourage patrons to move from those companion seats. He doesn't remember whether or not he offers a pass, but our policy, which is set forth in the record, is clear that we will offer a pass if it will result in someone moving. Quite rudely, that individual said no, he would not move. He had gotten there early with his son to view that movie, and he was not going to move. At that point, we, the management, had discussions with the plaintiffs. Plaintiffs were obviously upset about this. We offered them passes to see either that movie, which was then screening in other auditoriums in the same theater, or to come back and see another movie. They asked for the phone numbers for our district manager. We gave them to them, and they indicated they would be filing this lawsuit, which they did. Why wasn't the mother with the stroller and the children asked to move? I don't know. As we set forth in the record in the declarations of the AMC theater manager and AMC's vice president, we will do, AMC will do everything in its power to accommodate the request for companion seats. It wouldn't be very hard. Why don't, why do you allow people to sit in those companion seats who are not disabled or companions? And why don't you just put a sign on them or a rope or something that tells people not to sit there? Instead, it tells them they can sit there, but maybe they'll have to move. The ADA specifically says with regard to those wheelchair spaces, the companion spaces, that they may be used by when not needed. But you don't know whether it's needed until shortly before the time. So if you just kept them available, that's not very hard. Until 10 minutes before, then they could be used by other people. So it's not that you've done everything you could do. It wouldn't be very hard to deal with this problem. Well, at some point, though, we run into the problem of determining who is a companion, how many companions. One companion per wheelchair. That's what's what's hard. What's hard about determining who's a companion? A man in a wheelchair comes in with his wife. You have a problem determining it's a companion. No. What about the three children, though? They want to say children aren't companions. And I guess this is exactly the sort of guidance we need. The order we have from the court simply tells us to ensure that these spaces are not used by non-companions. We need to understand what that means. We need to understand what sort of questions we have to ask. For example, a situation that we're concerned about is an individual with a walker comes into a movie theater. He stores that walker in the wheelchair space and uses the adjoining companion seat to sit and watch the movie. We now have an individual who comes in who wants, with a companion in a wheelchair, who wants to use that companion seat and says, will you please ask this individual with a walker to move? The companion seat, which is the person who's supposed to be using that, is reserved for my companion. Under that circumstance, under the court's order, I believe we have the obligation to go to the individual in the walker and tell him you must move because you are not a companion. Here's an individual with a disability who is a companion. Nevertheless, he is an individual with a disability who would like to transfer from his walker to a chair or from his wheelchair to a chair. And that's the dynamic that we are having a hard time addressing here. Well, you know, the law doesn't always provide an answer to every possible contingency. It requires some reason on the part of people. I mean, you can get a statute that tells you what's criminal. It doesn't spell out the answer to every single possible question. So I suppose you would say, well, we don't know whether we'd be committing a crime because here I'll give you a hypothetical where something might happen. The law doesn't – is not a code with, you know, every possible case that could arise. I understand that. And your point, your hypothetical is a very well taken hypothetical, except applying it to the order that we have hanging over us right now. It still doesn't resolve the situation of we have somehow secured these seats, asked people not to sit in them with additional signage. Somebody still sits in them. Explain what you think is the problem with the order right now, what it is that leaves ambiguous to you. There's two problems I have with the order right now. The first is that it doesn't provide us any guidance. It simply says that we must ensure that these seats are made available for individuals with disabilities and their companions. It doesn't define how many companions. It doesn't define the scope of insured. Based against our policy, presumably the Court entered this order because the Court found that our current policy was not in compliance with the ADA. That being the case, and the only record of our policy is that we will do everything short of physically, bodily evicting someone, we take that to mean that insure means bodily, physically removing someone from those seats. Can you eject people from the theater? Can't you? I mean, like any other public place, if a patron is assigned to say, we reserve the right to refuse service to any person. If a patron is not complying with the disability law, as you have tried to make accommodations in the theater, can't you tell them, I'm sorry, you have to leave and here's your money back. Goodbye. Yes, that's what we do. Then where do we draw the line? Do we physically go in? Well, what do you do? Do you happen to have any theaters like the Bridge where there's reserved seating? No, we don't have any reserved seating. Well, that's fortunate because you might not know what to do if you had reserved seating and someone who didn't have a right to sit in that seat sat there. But just suppose somebody got in without a ticket and sat in the seat. What would you do? We would ask security or the police to remove them. Okay. Well, then I guess you could do the same thing with somebody who's sitting in a disabled seat. But again, and again, if that's the we're struggling with what the word ensure means, if that's what the court intended, then I think it intended you do what you would do with somebody who's sitting in a seat and isn't supposed to under your policy, whether it's somebody who didn't buy a ticket, somebody who was drunk, someone who took his clothes off. You know what you would do normally. I would think you could put a rope across the seat and not release it till 10 minutes before. There are all kinds of things I think that could do. And it still begs that the rope still begs the question of people would in a sold out condition pick up the rope, sit there and then do the same thing you would with someone without a ticket. It's like somebody who doesn't have a ticket for that seat. But again, the more troubling situation is the situation, and this is better equated to what we see on public transportation where we have areas where people are asked to leave these areas reserved for individuals with disabilities. What do we do if we have someone who brings in a wheelchair and decides to transfer for a three-hour movie from his wheelchair to the companion seat, yet the Fortunes come in and say, hey, look, this situation is designed under the ADA for us. And they're right. Can't you fold the wheelchair and put it somewhere else and let the other people pull it? It depends on the fire codes. It depends on what the wheelchair can pull. Well, it just seems like you're creating problems instead of trying to comply with the law that requires you to accommodate. It seems to me there's so many common sense answers here. So what this argument is making me think about is, you know, what is really going on? Why is it so difficult to use common sense to comply with this law? I mean, is it more expensive for the theater to comply? Is it the directions that you have to give your employees? What is it about this that makes it difficult for you to comply? No, it really is. It's not that there's some ulterior motive beyond us trying to seek more clarification. This truly is you have to spread it across the number of theaters, screens we have, 2,000 screens across the nation, the number of people who come through. The fact that at some point we may encounter the exact situation, as hypothetical as it seems to you, of a disabled individual transferring from a motorized wheelchair into the companion seat and having this order saying that that disabled individual must be evicted, asked to leave, removed, something along those lines, ensured that those seats are available. Did you go to the district court and say, look, we have your order and we're very confused because here are the kinds of problems we have. Would you mind clarifying the order and tell us how to solve these difficult problems? Are you asking if we did that? Yes. Yes. That's part of the transcript of our order. And the district judge said that she thought this was clear enough? Yes. She actually said she would leave to you to work out the logistics. Exactly. So you can't work them out? Is that the problem? The problem is that we think that the issues that we raised are real and that they create real conflicts in the law. We also think that our policy is compliant with the ADA, that our policy of asking individuals to move, incentivizing them, but not revoking their ticket rights is compliant with the ADA for the reasons set forth in the brief. And we also think that this situation does not, is moot under the ADA. The plaintiff does not have a right of standing because it is very unlikely that this will occur again. That is somewhat of a hollow argument, except that the plaintiffs here, the specific plaintiffs here, go to the movies quite often. And as they've set forth in their own papers, have not encountered this situation since that time. And they, I forget what they say, but they go to the movies several times a month. And it's been many months since this happened and they haven't encountered this situation again. So I think there is a real mootness issue to this. I'd like to, unless there's any other questions, I'd like to reserve some time for questions. Thank you, counsel. Thanks. Good morning, Your Honors. Russell Handy representing the plaintiff in this case. I'd like just initially just to touch on what Mr. Hurley said right at the end there. He said that this is a moot issue because they continue to go to the theaters and they don't have the problem. I have two concerns with that representation. First of all, it was addressed in the lower court and the district court dealt with that. The uncontroverted testimony is that they now go 45 to 60 minutes early to every movie theater to avoid this very problem. And so they have had their lives impacted on this. They are suffering from present and ongoing circumstances and they take remarkable measures to avoid this same problem again. And so to say the court called it disingenuous to say it hasn't happened again because now they're going an hour early to avoid that very problem. So that's not entirely fair. Second of all, with respect to the issue of mootness, the standard for mootness is a very high standard and the court cited it. And I quote from Friends of the Earth, United States Supreme Court case, saying that only where it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to occur again. And, of course, these are people that go every single week. They go to that same theater every single week. It has happened in the past and the defendant has stoutly refused to change his policy. So it's a very high standard to say that this is moot. And they didn't meet that standard. When you say it's refused to change its policy, what is it not doing that you would like it to do? Well, right now, as their stated policy is, as they put in the brief, if it's an empty theater or it's not filled up too near sold out, they'll ask someone to move. They won't require them to move. They'll just ask someone to move. If it's sold out, they won't even ask someone to move if it's going to be a sold out theater. We do not think that complies with the Americans with Disabilities Act. There's 230 seats in this theater. There's only four that can be used by wheelchair users and their companions. They shouldn't have to compete with the public at large for those very few spaces that they can use. He seemed to suggest there were eight because there were two sets of these. So you're saying there's four? Four companion seats. Right, I got it. Four companion seats. And so four opportunities to pair with a wheelchair user and their attendant or companion. You're not arguing that family members, if you have a wheelchair person and a companion, you're not arguing that their three children should take all the other spaces, are you? Not at all. The only one that's an actual companion seat is the one that's directly next to the wheelchair seating space. And it's not different than any other seat in the theater. The only thing that makes it a wheelchair companion seat is its location. It's just right next to the blank space. And so the other seats are not wheelchair companion seats. I mean, they may be sat in by other family members perhaps, and that's a bonus, but they are not wheelchair companion seats. Is it correct that they only have to provide one companion seat for two wheelchairs? I'm not sure if that's correct or not. And that wasn't an issue that was in the underlying court. And so I don't know if the representation made to have extra is right or not, because it was stipulated early in the case that the physical dimensions of the theater met the guidelines. So that was never an issue. It was never an issue about whether or not it was constructed properly. It was always about the policies and procedures. No, no, they're not saying it's not constructed properly. They're saying they're doing more than required by providing a companion seat for each wheelchair where they're only obligated to provide a companion seat for every other wheelchair. You don't know whether that's the regulation. It's an interesting statement. It was not part of the underlying record. It was never raised as an issue, never had an opportunity to look at it. It doesn't make much sense. I mean, that doesn't mean every regulation makes sense, but it wouldn't be a very sensible regulation to say every other person can have a companion. And that's why I suspect that I have some concerns with that interpretation when I heard it. Well, that's all right. I just was curious about whether you were familiar with that regulation. With respect to the actual injunction that was issued, throughout the oral argument, the transcript, and even during a preliminary conversation that took place on the phone, there has been a series of questions, problems that have been raised by the defendant, and the Court has dealt with each one and explained, and we've worked through a number of them, but then new ones keep arising. And there is no way that any injunction issued by the Court could address every possible scenario because there will always be new ones that people can come up with. And that's why I think it's appropriate for the district court to clearly identify what is prohibited, clearly identify what is being enjoined, and then leave it to the defendant to work out the logistical matters. That seems appropriate. Actually, the district court judge talks in terms of priority. Right. So I don't know how this would work, but if you had two wheelchair people and one had a medically necessary companion, but one did not and there was another disabled person, that companion seat wouldn't necessarily accommodate them, would it? That's right. And there's a concern in the disabled community that there's not enough disabled wheelchair seating areas and companion seats, but that's for the legislature to make determinations on whether they want to amend the ADAG, the Americans with Disabilities Act Accessibility Guidelines, and that's constantly under revision. But for the purposes of the theater, they don't have to do that sort of inquiry. They don't have to interrogate and try to make decisions. Who has more right to it? And the Court addressed that issue and said, no. If there's a wheelchair user and their companion and they've taken that seat, no other wheelchair user and companion that shows up has a greater claim to it. This is simply a matter of providing priority use between wheelchair users and their companions and non-wheelchair users and their companions to those wheelchair user companion seats. That's it. And it's very simple. It's all we wanted. It would have solved the problem in this case and in any other case like this. If there are some extremely new circumstances that arise, that will be dealt with in another case. And, you know, we can't deal with everything in this case. But in this case, all we asked for and what the Court gave us and what I think is appropriate is that if there's a competition for this limited resource between a wheelchair user and a companion and a non-wheelchair user, non-companion, you have to give priority use to the wheelchair user and companion. It's federally mandated. Just like they regulate other laws, no smoking in the theater, they'll strictly enforce that. They can do it here as well. Okay. Tell me something factually again because this is a little bit confusing. So according to AMC, you have a companion, wheelchair, space, right? Mm-hmm. Wheelchair, space, companion. So how was this father and son occupying the companion? They weren't in the wheelchair space. No. So where were they? How does this work? Yeah. So it's like let's say that these two were actual seats and there's a space. This is a wheelchair space. So they were sitting in those two seats. And those two seats are really nice because they have the benefit of being like an aisle seat where you're free on one side but they're in the middle. I see. And so you can understand why people want to sit there. And certainly the lady with the stroller, she probably had a baby that was asleep or whatever, she doesn't want to transfer the kid and she can keep him in the stroller. There's a lot of benefits to those seats. They're just not for people who aren't wheelchair user companions. And so you can understand why there's a desire to use those seats. But there just needs to be some sort of policy or procedure or practice whereby there's priority use given to people who actually need it. And so in that situation, you had those two people sitting in the companion seat. One person was in a companion seat and one person was just in a seat that could be used by anybody. Right, just next to them. That's correct. And so we think that it is fairly easy for a theater, for a sophisticated corporation like AMC to come up with a policy or a practice that would honor this injunction to say, look, we're going to give priority use. And there's so many ways to do it. And in this case, the record actually was clear that they did not offer any incentives to move. They didn't say we'll give you free passes. The plaintiff and his wife testified in their deposition. It was in the declaration. It's in the supplemental excerpt of record that he did not give any incentives. And when he was there. Incentives to whom? To the non-disabled person? Right, to the non-disabled person. No incentives like I'll give you, we'll give you free passes, we'll do this or that if you move. They did nothing like that, even though it's in their policy. That wouldn't have satisfied you anyway, would it? Oh, no, it would have if he had accepted that. If he had accepted it. But if they'd offered it to him and he'd said no, that would not have solved the problem. No, it would not have solved the problem. But my point is that they're when they say we've done it, we do everything short of making the move or forcibly evicting or dragging them by the scruff of their collar out of the theater. That's not entirely true. There's other ways, as you suggested, to rope it off, to have better signage, to have attendants that will look at that when they know it's going to be a sold out situation. There are other ways to do this. Smart minds working together can come up with resolutions. I don't know why it's any different from any any person who's not in his seat properly or not behaving properly. The theater has to do something. If someone talks throughout the movie, they're going to have remove the person or if he smokes or does anything. And there's no doubt that anyone who is disruptive, who doesn't follow the rules and procedures set down by the managers, that they can be evicted and properly. So and there's a whole. In fact, the district court came up with a list of those things, talked about smoking laws, talked about just like that. Someone doesn't pay for a ticket and goes in there for a six dollar ticket. They'll call security and evict someone. But for a federally mandated civil right, they apparently are unable or unwilling to evict someone. And that and the disparity is to us remarkable. And we think that this injunction is necessary and that it can be carried out. Thank you. Thank you. Just a few minutes, Your Honor. I would direct the Court to volume 1 of 2, tab 5, page 66, 066, which lays out our our policy. And again, if this were, I think this would be a different case if this were a case as to what happened there then, the single instance of discrimination. But of course, this is an ADA case where the only relief available is injunctive relief. And what's at question here is whether or not our policy complies with the ADA. And the reason we're here is because this is a policy that we use not just at this theater, but at all of our theaters. And we need to know if this policy violates the ADA, how does it violate the ADA, why does it violate the ADA? This is our policy. It is AMC's policy to accommodate the companions of wheelchair users in whatever manner they reasonably request. AMC will ask guests seated near wheelchair spaces to move to allow companions of individuals in wheelchairs to sit near wheelchair spaces. In most cases, AMC will offer the guest sitting in companion seat free passes to encourage that guest to change seats. The only limitation on AMC's policy of accommodating the requests of companions is that AMC will not physically remove a guest who is already sitting in the companion seat and refuses to move. That's the uncontroverted policy that's set forth in the record. If that policy violates the ADA, we need to know that. Well, I think the Court said it does. So now you know. And I guess then the question is, okay, in the world of applying the policy, injunctive relief needs to be fairly specific. What is it that we need to do? At all we're seeing here, and I think this is what the Court's going to tell us, is physically evict people. Well, there are a lot of things you can do. We've already talked about some. Don't let them sit there in the first place instead of allowing them to sit there. That's one thing you can do. Very easy. Rope it off until 10 minutes before. I don't understand why you have such trouble with this, as counsel said, when you don't have trouble with somebody who didn't buy a ticket, when you don't have trouble with anybody who's disorderly, you wouldn't have trouble with somebody who smoked. You only have trouble with somebody who's protected by federal law. Well, the trouble is that it interacts in a very sensitive area, which is wheelchair users. We're very concerned. There's lots of litigation going on on the location of wheelchair spaces. And when it comes to the potential of evicting a disabled individual from a companion seat because he's transferred from a wheelchair space, he's left his wheelchair in the wheelchair space and transferred to the fixed seat,  And what do we do? All the rest of it is not a real problem. What really bothers you is what do you do if a disabled person is occupying a companion seat? We have someone who's transferred from a walker or a wheelchair into the companion seat. How do we reconcile that with the judge's order? Did you ask the judge that issue? The judge indicated that was not before her. Okay. Well. Well, I'm just wondering, in your hypothetical, does this disabled person who is sitting in the companion seat need to sit in the companion seat? I mean, I'm just. It would depend on the theater and the fire code. It certainly is very convenient for them. So what do you mean the fire code? Well, generally, you're not allowed to block access aisles. We're getting beyond the record now. But generally, my clients tell me you can't just simply store wheelchairs, walkers in the access aisles. You would be able, however, to leave the wheelchair or walker in that wheelchair space empty, while you then use the adjoining companion seat. Right. But what if someone, a disabled person in a wheelchair came by and needed that companion seat? Could you ask the other person to go sit in his wheelchair? And under the current order, we believe that we would. The ensure language refers to the companions. We believe we would have to ensure that that person got up out of the companion seat and got back in their wheelchair and either moved to another wheelchair location or left the. If they could. And if they were in a walker and they couldn't go anywhere else, then wouldn't that place be what you would have to provide for them under the law? And there we run into the conflict that we're faced with and why we truly are here. Not just because we want to avoid operating overhead or create problems or more work for the court. That truly is the situation. I don't understand. You're worried about somebody in a wheelchair shifting to the companion seat. Yes. But he'd be using that wheelchair space for his wheelchair if he was sitting in it. That's right. So it wouldn't be available for the next wheelchair anyway. That's right. So the person who's complaining that he can't put his companion in that seat that you're worried about wouldn't have a place for himself anyway because the wheelchair is there. That would be that would be correct. So there's no problem. An unoccupied wheelchair, though. It's not. I mean, I could I can see the fourteens being upset, saying that individual, first of all, is using a companion seat. They're not a companion. But look, if he weren't using the companion seat, he'd be sitting in his wheelchair. So there'd be no place for the fortunes wheelchair. So there's no problem. To address the one other point of difference between wheelchair area and the number of companion spaces. The distinction is in the ADAG regulations, the Americans with Disability Act regulations, Section 4.33.3 refers to and quantifies the number of companion seats based on wheelchair areas. And yet that same regulation uses the word wheelchair spaces later in the regulation. 4.33.3 says you need only have one companion seat per wheelchair area. We provide one companion seat per wheelchair space. So when you said per wheelchair area, they're saying that if you had eight wheelchairs in the area, you only have to provide one companion seat? I'm saying yes, within the restrictions that there are other guidelines that limit the number of wheelchairs because of access. But whatever your area is of wheelchairs, you need only have one companion seat for that area. I find that hard to believe, but I will certainly look at that regulation. Which regulation is that? It's 4.33.3 of the Americans with Disabilities Act regulations. I'm unfortunately not going to say it. You said 4.32.3 a minute ago. I'm sorry. 4.33.3. 4.33.3. I'm looking for the Code of Federal Regulations site. It's, if I have this right, 36 CFR parts 1190 and 1191. Did you make that argument to the district court? Yes. It's also part of our law. Did she reject that, saying unrelated only to construction? I think what was at issue here was our policy and not the number of wheelchair spaces or wheelchair seats. Again, as Mr. Handy indicated, we did stipulate in the beginning of this case that the configuration of the theater was in compliance with the Americans with Disabilities  Thank you, Your Honor. Thank you. All right. Case just argued will be submitted. Next case on the calendar is Akkar versus Berzynski. Thank you.
judges: Browning, Reinhardt, Wardlaw